1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

TRACI M. HILL,

Plaintiff,

11

CASE NO.      C07-5297BHS-KLS

12

v.

REPORT AND
RECOMMENDATION

13

MICHAEL J. ASTRUE, Commissioner of
Social Security,

Noted for July 11, 2008

14

15

Defendant.

16

17

Plaintiff, Traci M. Hill, has brought this matter for judicial review of the denial of her application

18

for supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned

19

Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by

20

Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the

21

remaining record, the undersigned submits the following Report and Recommendation for the Honorable

22

Benjamin H. Settle's review.

23

FACTUAL AND PROCEDURAL HISTORY

24

Plaintiff currently is 27 years old.[1] Tr. 25.  She has three years of college education and past work

25

experience as a cashier, data entry clerk and office helper/clerk. Tr. 15, 62, 67.

26

On April 14, 2003, plaintiff filed an application for SSI benefits, alleging disability as of

27

28

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

September 15, 1997, due to a bipolar disorder and schizoaffective disorder. Tr. 15, 51-54, 61. Her

application was denied initially and on reconsideration. Tr. 25-27, 35. A hearing was held before an

administrative law judge ("ALJ") on November 7, 2005, at which plaintiff, represented by counsel,

appeared and testified, as did a vocational expert. Tr. 432-77.

On December 30, 2005, the ALJ issued a decision, determining plaintiff to be not disabled, finding

specifically in relevant part:

> (1) at step one of the sequential disability evaluation process,[2] plaintiff had not
> engaged in substantial gainful activity since her alleged onset date of disability;
>
> (2) at step two, plaintiff had "severe" impairments consisting of a bipolar disorder
> and a schizoaffective disorder;
>
> (3) at step three, none of plaintiff's impairments met or equaled the criteria of any
> of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and
>
> (4) at step four, plaintiff had the residual functional capacity to perform work with
> no exertional limitations, but with certain non-exertional limitations, which did
> not preclude her from performing her past relevant work.

Tr. 15-23. Plaintiff's request for review was denied by the Appeals Council on April 20, 2007, making the

ALJ's decision the Commissioner's final decision. Tr. 4; 20 C.F.R.§ 416.1481.

On June 13, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision.

(Dkt. #1-#3). The administrative record was filed with the Court on September 24, 2007. (Dkt. #10).

Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in

the alternative, for further administrative proceedings for the following reasons:

> (a) the ALJ erred in evaluating the medical evidence in the record;
>
> (b) the ALJ erred in finding that plaintiff's impairments did not meet or equal the
> criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03 and/or § 12.04;
>
> (c) the ALJ erred in assessing plaintiff's credibility;
>
> (d) the ALJ erred in evaluating the lay witness evidence in the record;
>
> (e) the ALJ erred in assessing plaintiff's residual functional capacity;
>
> (f) the ALJ erred in finding plaintiff capable of performing her past relevant work;
> and

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION
Page - 2

(g)     the Commissioner failed to meet his burden of showing plaintiff was capable of performing other work existing in significant numbers in the national economy.

Defendant agrees the ALJ erred in determining plaintiff to be not disabled, but argues this matter should be remanded for further administrative proceedings.  For the reasons set forth below, the undersigned agrees with defendant, and recommends that the ALJ's decision be reversed, and that this matter be remanded to the Commissioner for further administrative proceedings.  Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld."  Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility."  Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons."  Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A.   <u>Dr. Gardner</u>

In a letter dated December 23, 2003, Patricia Gardner, M.D., who had been treating plaintiff for her mental impairments since at least early December 2002, wrote a letter in which she opined that plaintiff's symptoms were "so severe" that she had been "unable to work since 2001." Tr. 336.  In addition, Dr. Gardner stated that despite being "maintained on a complex and expensive medication regimen," plaintiff still was "barely functional as an outpatient," and could not drive "because of her symptoms." <u>Id.</u>  Lastly, Dr. Gardner believed plaintiff "would very likely suffer a severe decompensation and require hospitalization if she" did "not continue on her medications." <u>Id.</u>

With respect to Dr. Gardner's opinions, the ALJ found in relevant part as follows:

. . . As a treating medical doctor, Dr. Gardner's opinions would ordinarily deserve significant consideration. However, the course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled . . . , as the doctor has reported in this recent letter. In fact, she often encouraged the claimant to seek employment . . . Moreover, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. Because Dr. Gardner's opinion in this letter is not well supported by medically acceptable clinical and/or laboratory diagnostic studies and are inconsistent with other substantial evidence in the case record, including her own treatment notes, her opinions cannot be given controlling weight . . .

I have given more weight to the clinical chart notes . . . where the claimant's mental health condition was monitored on a monthly basis. There is nothing in the record to substantiate disability predating 2002. As of September 2002 to the present, the medical evidence of record provides a consistent and well documented diagnosis and treatment pattern. While she was no doubt very ill in September and October 2002, claimant's mental illness improved and stabilized with medications prior to filing for disability benefits. . . .

Tr. 21. Plaintiff argues that none of the reasons the ALJ gave for rejecting Dr. Gardner's opinions are clear and convincing. The undersigned disagrees.

The undersigned does agree that the first reason provided by the ALJ – that the course of treatment pursued Dr. Gardner was not consistent with what one would expect if plaintiff were truly disabled – while clear, is not convincing. The ALJ does not state what course of treatment would be consistent with a claim of disability, let alone point to any specific medical or other evidence in the record showing the treatment Dr. Gardner did pursue was inappropriate for one with a disabling mental impairment. As such, it appears the ALJ improperly may have substituted his own lay opinion for that of Dr. Gardner. See Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own opinion for findings and opinion of physician); McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent medical opinion); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978) (ALJ not free to set own expertise against that of physician who testified before him).

The undersigned also agrees with plaintiff that it was improper for the ALJ to reject Dr. Gardner's opinions on the basis that the possibility exists she may have been trying to assist plaintiff because, for one

reason or another, she sympathized with her.  As pointed out by plaintiff, the ALJ essentially is engaging in speculation here.  Again, the ALJ cites no specific portions of the record to support these conclusions. For the same reasons, the ALJ's statement that Dr. Gardner provided the opinions she did because patients <u>can</u> be quite insistent and demanding in seeking support for their claims is equally invalid.

In addition, the ALJ was not correct in stating that Dr. Gardner's opinion departed "substantially from the rest of the evidence of record." Tr. 21.  While, as discussed below, there is significant medical evidence in the record that does contradict that opinion, there is other such evidence that, at least to one extent or another, supports it.  For example, as discussed in greater detail below, Beal Essink, M.D., opined in mid-September 2003, that while plaintiff's "compliance with treatment" had been good, "her prognosis for significant change or improvement" was "quite guarded," and Dr. Essink predicted "she would have a severely below average ability to tolerate stress." Tr. 197.  In early August 2005, Robert E. Schneider, Ph.D., described plaintiff as presenting as being"fragile", opined that she likely was "very sensitive to her interpersonal environment and to any expectations or criticism," and found her to be markedly limited in her ability to respond appropriately to and tolerate the pressure and expectations of a work setting. Tr. 280, 285.  Nevertheless, as explained below, the other reasons provided by the ALJ for rejecting Dr. Gardner's opinions are legitimate.

Plaintiff argues the ALJ's notation that Dr. Gardner often encouraged her to seek employment is unconvincing, as it is contrary to one of the purposes of the Social Security Act – to encourage even those who are disabled to seek and attempt work.  Although it is not clear that plaintiff "often" was encouraged to look for work, Dr. Gardner did tell plaintiff in mid-February 2005, that she should "call Michelle at Clearview and see whether there are any volunteer or paid opportunities available to fit her experience." Tr. 388.  In addition, in late May 2005, Dr. Gardner stated that she "encouraged" plaintiff "to follow through with her plans for employment," as that would "help both with her financial situation as well as with some daily structure and a source of self-esteem." Tr. 382.  Given these statements, it was entirely reasonable for the ALJ to presume Dr. Gardner would not have so encouraged plaintiff, if she did not in fact believe she was capable of performing work-related activities.  Thus, there is no error here.

Nor was the ALJ entirely remiss in rejecting Dr. Gardner's opinions because they were inconsistent with other medical evidence in the record which showed plaintiff's mental impairments had improved and

stabilized on medications after September and October 2002.  It is true that, as discussed in greater detail elsewhere herein, the record contains opinions from two examining medical sources who, similar to Dr. Gardner, found plaintiff to be significantly limited in her ability to tolerate stress or change in the workplace or environment.  See Tr. 197, 280, 285.  On the other hand, there is other substantial medical evidence in the record, including Dr. Gardner's own treatment notes, that, as found by the ALJ, medications enabled plaintiff to experience improvement and stabilization in regard to her mental condition.

In early December 2002, plaintiff reported that she currently was "doing very well on her meds" and was "pleased with her progress." Tr. 240.  Dr. Gardner also noted that plaintiff's medications seemed "to be working well without causing her any significant problems." Tr. 240.  Plaintiff told Dr. Gardner in early February 2003, that her mood had been "quite good," and that she was not having any psychotic symptoms or medication side effects. Tr. 426.  Plaintiff also reported that she continued "to do quite well emotionally on her current medication regime," and Dr. Gardner commented that she had "done so well clinically" on her medication, "that it would be risky to have to change it." Id.  In late February 2003, plaintiff reported that she felt her medication "helped keep her mood fairly even," and Dr. Gardner found her bipolar disorder to be in partial remission. Tr. 425.

In late April 2003, plaintiff reported that she was "not feeling depressed or having any difficulty with her moods," and was wondering if she needed "to continue the Depakote at all or if she could try going off of it." Tr. 422.  Dr. Gardner found her bipolar disorder to be in remission, and discontinued her use of Depakote. Id.  Although plaintiff reported some increase in depressive symptoms in late June 2003, she denied having a recurrence of her paranoia or delusions. Tr. 419.  Dr. Gardner noted that it had been "many months" since plaintiff "had any psychotic symptoms," and felt that it might be possible to reduce another of her medications during subsequent visits. Id.  In late July 2003, plaintiff reported that her mood had improved "quite a bit" as the result of her medication, that it had been "stable for several months now," and that she was "not having any psychotic symptoms." Tr. 417.  Once again, therefore, Dr. Gardner found plaintiff's bipolar disorder to be in remission. Id.

Plaintiff reported in early September 2003, that she had "not been having auditory hallucinations or any delusions," and her mental status examination was fairly unremarkable. Tr. 414.  Her bipolar disorder remained in partial remission. Id.  Similar findings were made by Dr. Gardner in early November, 2003

1   (Tr. 413), although some increase in symptoms in mid-December 2003, caused her to worry that plaintiff

2   was "becoming clinically depressed and/or slipping into psychosis" (Tr. 411).  On December 23, 2003, the

3   day Dr. Gardner provided her written opinion concerning plaintiff's severely impaired ability to function,

4   plaintiff reported that she was "doing better," with greater energy and motivation, since increasing one of

5   her medications over the past week and adding another. Tr. 410.

6   Accordingly, for more than a year prior to when Dr. Gardner opined that plaintiff was still "barely

7   functional" (Tr. 336), the record shows plaintiff's medications generated significant improvement and

8   stabilization overall in her condition.  Indeed, as set forth above, while Dr. Gardner also opined in her

9   letter that plaintiff "would very likely suffer a severe decompensation and require hospitalization," this

10   would be the case only if she did not continue on her medications. Id.  Thus, it appears that as long as

11   plaintiff remained on her medication regimen, at least according to Dr. Gardner, the likelihood of

12   decompensation would disappear or be much decreased.

13   Indeed, Dr. Gardner's treatment notes show that plaintiff continued to do well on her medications

14   for a substantial period of time thereafter.  In late March 2004, for example, Dr. Gardner commented that

15   plaintiff currently was "doing better" from "a psychiatric standpoint," and that a treatment program she

16   had been participating in "was very helpful in improving her depression and motivation." Tr. 405.  In mid-

17   June 2004, plaintiff told Dr. Gardner that she had been "doing quite well in recent months," and felt that

18   one of her medications was "working very well for her." Tr. 402.  Dr. Gardner diagnosed her bipolar

19   disorder as being currently in remission, noting also that she had been "doing well." Id.

20   Although in early August 2004, plaintiff reported that things were "not going as well now as they

21   were before," she also reported that she had not been "taking her night meds." Tr. 399.  Thus, while Dr.

22   Gardner did comment that plaintiff appeared "to be developing further depression," she further noted that

23   this occurred "since stopping the Wellbutrin." Id.  In late August 2004, plaintiff stated that she had been

24   "good", and that "resuming Wellbutrin" had been "quite helpful." Tr. 398.  She was "back to her normal

25   energy level and motivation," she denied "any active symptoms" and felt she was "doing well." Id.  Dr.

26   Gardner deemed her schizoaffective disorder, bipolar type, to be in remission. Id.

27   Plaintiff reported in mid-December 2004, that her mood was "a lot better," denied any paranoia or

28   auditory or visual hallucinations, and stated that things were "going fairly well." Tr. 395.  Her mental

status examination was unremarkable and, again, her mental impairments were found to be in remission. Id.  In mid-February 2005, some increased symptoms were reported, but plaintiff stated that overall she had been "feeling okay," and her mental impairments remained in partial remission. Tr. 387.  In late May 2005, plaintiff told Dr. Gardner that she had been "okay" and that she was "feeling good." Tr. 382.  Once more, plaintiff's impairments were noted to be in remission. Id.

In early August 2005, plaintiff stated that she had been "pretty good," that she had "not been having any extreme ups and downs in her mood," that she had been "sleeping well," and that she was having no auditory hallucinations, paranoia or suicidal thoughts. Tr. 381.  Plaintiff also denied "any medication side effects," and was "taking less Topamax than prescribed," which had "been working just fine for her." Id.  Dr. Gardner opined that she remained in remission. Id.  Although there was some increase in symptoms, resulting in a hypomanic diagnosis in late September 2005, she was back in remission by mid-October 2003, reporting that she "had been doing a lot better simply from the increase in Trilafon . . . two weeks ago," that she was "sleeping well" and that her mood was "stable". Tr. 376.

Similarly, in regard to December 23, 2003 opinion that even on her medication regimen plaintiff was barely functional, this too is contradicted by Dr. Gardner's treatment notes.  For example, plaintiff told Dr. Gardner in late February 2003, that she "felt bored at home and so" had "been going out socializing." Tr. 425.  In late April 2003, plaintiff reported that she had been "spending time with friends out in the evenings." Tr. 422.  In late March 2004, plaintiff reported that she was "getting up eariler in the morning," was "more active socially," had planned "to start an exercise program with her mother," had "her friends bring their kids out to the ranch to visit with the horses," and had been "more involved with caring for the horses in recent weeks." Tr. 405.

In mid-June, 2004, plaintiff told Dr. Gardner that she had been "looking at jobs," had "done two interviews but decided she did not want those jobs," and would "be going to Work Source for additional job placement assistance." Tr. 402.  She also reported having "an active social life, going out to karaoke with her friends regularly," and "working with her horses." Id.  In early August 2004, plaintiff stated that she was "staying out till wee morning hours." Tr. 399.  She reported in late August 2004, that she was "taking care of her hamster and her horses daily," and again had been "going out to karaoke." Tr. 398.  In mid-December 2004, she told Dr. Gardner that she was "socializing" and did "some volunteer work as a

1   Salvation Army bell ringer and enjoyed that." Tr. 395.

2       Plaintiff reported in late May 2005, that she had "put in a job application," that she  would "be

3   doing inventory somewhere at the end of this month," and that "[i]f things work out well, they might offer

4   her a regular job." Tr. 382.  In early August 2005, plaintiff stated that she had been "going out to the tavern

5   once or twice a week," and that she "had a date last night." Tr. 381.  In late September 2005, plaintiff

6   again reported that she had been "going out at night." Tr. 377.

7       The above self-reports appear to directly contradict the opinion of Dr. Gardner that plaintiff was

8   "barely functional," and, along with the evidence discussed above of plaintiff's mental improvement and

9   stabilization, does create a valid basis for discounting Dr. Gardner's opinions, notwithstanding the other

10   medical source opinions in the record.  Progress notes from plaintiff's mental health counseling sessions

11   during the same time period largely paint a similar picture.  See, e.g., Tr. 198-201, 207, 213-14, 216, 218-

12   19, 227, 231, 233-34, 357, 359, 363-65, 367-68, 385-86, 389-90, 403-04, 415-16, 420-21.  Nevertheless,

13   given the ALJ's errors in evaluating the other opinion source evidence in the record discussed herein, on

14   remand Dr. Gardner's opinions should be reconsidered in light of that evidence as well.

15       B.    Dr. Essink

16       Plaintiff was evaluated in mid-September 2003, by Beal Essink, M.D., who diagnosed her with a

17   schizoaffective disorder, bipolar type, and gave her a global assessment of functioning ("GAF") score of

18   "approximately 40." Tr. 197.  During the mental status evaluation Dr. Beal performed, plaintiff exhibited

19   good eye contact in large part, and her speech was normal, without pressure or latencies. Tr. 196.  While

20   she showed mild psychomotor retardation, her affect was blunted, and both her insight and judgment were

21   limited, plaintiff's mood was "better, happy," her thought processes were goal directed, and her thought

22   content was without current suicidal or homicidal ideations, delusions or hallucinations. Id.  In regard to

23   plaintiff's condition and functioning, Dr. Essink opined in relevant part as follows:

24       . . . Although she cannot spontaneously report a history consistent with a manic
         episode, her history of being "over happy" for a period of time makes me wonder about
25       an underlying bipolar aspect to her underlying psychotic disorder.  She certainly has
         ongoing psychotic symptoms in the absence of mood symptoms (flat affect, avolition),
26       so I feel that schizoaffective disorder is the most accurate diagnosis at this time. . . .
         Overall, her prognosis for significant change or improvement is quite guarded.  Given
27       the claimant's psychotic disorder, I would predict that her ability to focus and
         concentrate would be below average.  Her pace and persistence would also likely be
28       below average.  I think she has an average ability to follow simple instructions but a
         below average ability to follow more complex instructions.  I feel that she would have

REPORT AND RECOMMENDATION
Page - 10

> an average to slightly below average ability to interact appropriately with others, including coworkers and supervisors, but I would predict that she would have a severely below average ability to tolerate stress, including work-related stress. I do think that the claimant has the ability to manage her own funds at this time given her recent history of properly managing her own funds.

Tr. 197.

With respect to Dr. Essink's opinion, the ALJ found in relevant part:

> It is noted that consultative evaluator Dr. Essink offered a "guarded" prognosis, and opined she would have a below average ability to interact, focus and concentrate if she attempted to return to work . . . However, Dr. Essink is not a treating doctor and had to rely on the claimant's subjective complaints and only had the records available as of the date of the evaluation, without the benefit of an ongoing treating relationship with the claimant. Therefore, Dr. Essink's opinion that claimant is "disabled" is given little weight. It is further noted he never said she was "disabled" or in any way completely precluded from maintaining meaningful employment . . .

Tr. 21. Plaintiff argues these are not legitimate reasons for rejecting that opinion. The undersigned agrees.

First, the fact that Dr. Essink is not a treating physician alone is insufficient to discount the weight given to

his opinion, as the opinion of an examining physician itself can constitute substantial evidence. Further,

while Dr. Essink may not have had the benefit of having all of the evidence in the record available to him

or of an on-going treating relationship, those facts alone too do not establish that an examining physician's

findings or conclusions are incorrect or unsupported.

In terms of the ALJ's statement that Dr. Essink had to rely on plaintiff's subjective complaints, that

finding is both untrue and improper in this case. Although certainly those complaints were an important

part of Dr. Essink's evaluation, they were by no means the sole basis for his conclusions. For example, in

addition to plaintiff's self-reporting, Dr. Essink clearly relied on the records he did have at the time, on his

observations of plaintiff, and on the mental status evaluation of her he performed. See Tr. 194-96. Further,

"when mental illness is the basis of a disability claim," the diagnoses and observations of psychiatrists and

psychologists constitute competent evidence when mental illness is the basis of a disability claim. Sanchez

v. Apfel, 85 F. Supp.2d 986, 992 (C.D. Cal. 2000) (citation omitted); see also Sprague v. Bowen, 812 F.2d

1226, 1232 (9th Cir. 1987 (opinion based on clinical observations is competent evidence).

Performance of a mental status evaluation on its own has been found to be a proper basis on which

to base a medical diagnosis as well. See Clester v. Apfel, 70 F.Supp.2d 985, 990 (S.D. Iowa 1999) (results

of mental status examination provide basis for diagnostic impression of psychiatric disorder, just as results

of physical examination provide basis for diagnosis of physical illness or injury). While it is true that Dr.

1   Essink never actually stated that plaintiff was disabled, he assessed her with significant mental limitations,

2   which the ALJ failed to address specifically.  As such, it certainly is possible – though no determination is

3   herein made – that those limitations could eventually result in a finding of disability.

4       On the other hand, as discussed above, the record contains other medical evidence that plaintiff had

5   made substantial improvement and was largely stabilized on medication both prior to and after the date Dr.

6   Essink performed his evaluation.  Thus, it is far from clear the ALJ would be required to adopt any or all

7   of Dr. Essink's findings and conclusions.  Accordingly, the Commissioner on remand should re-evaluate

8   this evidence along with the findings and opinions provided by Dr. Gardner and those of Dr. Schneider and

9   Jeff Hite discussed below.

10              C.      Dr. Schneider and Mr. Hite

11      In late October 2004, Jeff Hite, who does not appear to be a licensed psychiatrist or psychologist,

12  performed an evaluation of plaintiff, diagnosing her with schizoaffective disorder, bipolar type, and

13  alcohol abuse in remission. Tr. 305.  As a result of those diagnoses, Mr. Hite found plaintiff to be

14  markedly limited in her ability to: understand, remember and follow complex instructions and respond

15  appropriately to and tolerate the pressures and expectations of a normal work setting, and moderately

16  limited in her ability to: understand, remember and follow simple instructions; learn new tasks; exercise

17  judgment and make decisions; relate appropriately to co-workers and supervisors; interact appropriately in

18  public contacts; control physical or motor movements; and maintain appropriate behavior. Tr. 306.

19      In addition, Mr. Hite noted that while plaintiff was "currently stable on medications," she

20  continued to have difficulty with concentration and fatigue. Tr. 307.  With respect to plaintiff's prognosis

21  regarding ability to work, this Mr. Hite found to be "guarded given her history of decompensation when

22  placed under increased stress." Id.  In terms of the estimated amount of time plaintiff would be impaired to

23  the degree noted above, Mr. Hite opined that this would be from six to nine months. Id.  In an addendum to

24  the form he completed, Mr. Hite further opined in relevant part as follows:

25          Traci had some difficulty in her ability to understand, remember and follow simple
            instructions and process new/unfamiliar information . . . This appears to be related to
26          her diagnosis of Schizoaffective disorder and reported symptoms of poor concentration
            and focus.  She presents with adequate social skills and thought processes appears to be
27          intact.  When symptoms of depression and anxiety are present, she appears to have
            difficulty focussing [sic] on more complex instructions and the ability to tolerate the
28          pressures and expectations of a normal work setting.  This is supported by her inability
            to maintain successful employment since she lost her last attempt at employment in

1      2001.

2   Tr. 308-09.

3           In early August 2005, plaintiff was evaluated by Robert E. Schneider, Ph.D., who noted at the time

4   that her affect was blunted and her speech was slurred, which seemed "to reflect medication use." Tr. 284.

5   Dr. Schneider stated that while plaintiff was able to "smile and performed fairly well" on her mental status

6   evaluation, her initial presentation was misleading, as she was "slow and extremely fragile" and appeared

7   better than she was. Id.  Her judgment was within normal limits, as was her general knowledge, suggesting

8   average intelligence. Id.  However, she was "extremely slow" in performing mathematical calculations,

9   and was unable to perform even "very simple" ones. Id.

10          Dr. Schneider gave the following impression of plaintiff:

11          As noted, Traci is far more impaired than she appears.  She was very slow to perform
            even basic tasks on mental status.  It is notable that she and her counselor at Clearview
12          Employment are trying to find employment for her but if she can work, it will only be
            at the most basis [sic], low stress and low demand type of employment.  She is
13          considered to be functionally disabled at the current time, but she is encouraged to
            attempt either volunteer or basic vocational activities.

14
    Tr. 284-85.  Dr. Schneider found plaintiff's prognosis to be guarded, assessed her with a current GAF
15
    score of 38, and concluded as follows:
16
            Traci is slow to register and process information, slow to perform tasks and slow to
17          retrieve information.  She would have significant difficulty retaining information for
            employment.  She states she is able to get along with co-workers and supervisors, but
18          she presents as being fragile and it is likely that she is very sensitive to her
            interpersonal environment and to any expectations or criticism.
19
    Tr. 285.
20
            At the same time, Dr. Schneider completed a psychological/psychiatric evaluation form, in which
21
    he diagnosed plaintiff with a schizoaffective disorder, bipolar type, finding that as a result thereof, she was
22
    markedly limited in her ability to: understand, remember and follow complex instructions, learn new tasks,
23
    exercise judgment and make decisions, perform routine tasks, and respond appropriately to and tolerate the
24
    pressure and expectations of a normal work setting. Tr. 280.  Dr. Schneider also found her to be
25
    moderately limited in her ability to: understand, remember and follow simple instructions, relate
26
    appropriately to co-workers and supervisors, interact appropriately in public contacts, control physical or
27
    motor movements, and maintain appropriate behavior. Id.  He estimated that she would be impaired to the
28
    degree described above for a minimum of 10 months and a maximum of 14 months. Tr. 281.

REPORT AND RECOMMENDATION
Page - 13

Plaintiff argues the ALJ erred in failing to address both Dr. Schneider's and Mr. Hite's findings and opinions in his decision. Defendant agrees. So does the undersigned. That evidence constitutes significant probative evidence the ALJ should have considered, but apparently did not, or at least did not record that consideration in his decision. Such failure was error. Again, however, given the other medical evidence in the record showing significant improvement and stabilization in plaintiff's condition over time, remand for further consideration of the findings and opinions of Dr. Schneider and Mr. Hite along with that evidence and the opinions of Dr. Gardner is appropriate.

II.    The ALJ's Step Three Analysis

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id. The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098.

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R.§ 416.908. It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id. An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2. An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id. at *2. However, "symptoms alone" will not justify a finding of equivalence. Id.

The ALJ in this case provided the following step three analysis:

Treatment records reveal Ms. Hill's mental disorder results in "moderate" social and occupational functioning and has resulted in "one or two" repeated episodes of decompensation. There is no indication minimal increase in mental demands is likely to cause her to decompensate mentally. Nor is there evidence in the record indicating she is unable to function outside the area of his [sic] home. Evaluation of the impairments under the *psychiatric review technique* described in Section 12 of Appendix 1 does not reveal functional limitations manifested at the degree required to meet severity ("B" or "C") criteria of Section 12.04 of Appendix 1 . . . No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment.

Tr. 19.  Plaintiff argues that the medical evidence in the record, when considered in its entirety, reasonably would support a finding that she meets or equals Listing 12.03C.2 and/or Listing 12.04C.2.  She argues as well that while the ALJ mentioned Listing 12.04 in his decision, he did not adequately explain why she did not meet or equal the criteria contained therein.  Although the undersigned agrees the ALJ erred in his step three analysis, once more, remand for further proceedings is appropriate.

Listing 12.03 (schizophrenic, paranoid and other psychotic disorders) reads in relevant part:

Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met . . . when the requirements in C are satisfied.

. . .

C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

. . .

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; . . .

Listing 12.04 (affective disorders) in turn reads in relevant part:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. . . .

The required level of severity for these disorders is met . . . when the requirements in C are satisfied.

. . .

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

. . .

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; . . .

The undersigned agrees with plaintiff that contrary to the ALJ's findings, the record does contain evidence indicating that a minimal increase in mental demands may be likely to cause her to decompensate

1  mentally.  This evidence consists of the opinion of Dr. Gardner that plaintiff is "barely functional" and

2  "would very likely suffer a severe decompensation and require hospitalization" without her medication. Tr.

3  336.  In addition, Dr. Essink opined that plaintiff "would have a severely below average ability to tolerate

4  stress, including work-related stress. Tr. 197.  Dr. Schneider, furthermore, commented that plaintiff was

5  "fragile"and would "likely" be "very sensitive to her interpersonal environment and to any expectations or

6  criticism," and found her to be markedly limited in her ability to tolerate the pressure and expectations of a

7  normal work setting.  Tr. 280, 285.  Given the criteria of Listings 12.03C and 12.04C, however, it is not at

8  all clear that plaintiff should be found disabled at this step.

9       It is clear, as noted above, that Dr. Gardner felt the likelihood plaintiff would decompensate if she

10  were not on medication was high.  However, both Listing 12.03C and Listing 12.04C require that even on

11  medication a minimal increase in mental demands or change in the environment would cause an individual

12  to decompensate.  Dr. Gardner's opinion though is that such decompensation would occur only if plaintiff

13  went off her medication regimen.  This opinion, as discussed above, is supported by substantial evidence

14  in the record showing improvement and stabilization on medication.  Dr. Gardner's opinion that plaintiff

15  was "barely functional" despite her medication regime is not supported by the record, including treatment

16  notes from Dr. Gardner herself.  Those clearly show, also as discussed above, that plaintiff was

17  participating in activities on a regular basis at more than a barely functional level.

18       Dr. Essink's opinion in this context is less clear.  First, whether having a "severely below average

19  ability to tolerate stress" is the same or equivalent to being likely to decompensation with even a minimal

20  increase in mental demands or change in the environment has not been shown, at least on the basis of the

21  medical evidence in the record before the Court.  This therefore is an issue the Commissioner should re-

22  consider and resolve on remand.  In addition, Dr. Essink's evaluation report fails to indicate whether he

23  felt plaintiff's significantly diminished ability to tolerate stress would be present even when continuing

24  with her medication regime.  At least one of Dr. Essink's statements – that plaintiff's prior treatment

25  appeared to be appropriate for her diagnosis – indicates he may have believed such a limitation still would

26  be present. Tr. 197.  Again, though, it is an open issue that needs to be resolved on remand.

27       Finally, Dr. Schneider's opinions – that plaintiff was "fragile" and "likely" to be "very sensitive to

28  her interpersonal environment and to any expectations or criticism," and that she was markedly limited in

1    her ability to tolerate the pressure and expectations of a normal work setting – are fairly similar to those of

2    Dr. Essink. Tr. 285.  Again, it is unclear whether those opinions equate with being likely to decompensate

3    with even a minimal increase in mental demands or change in one's environment.  In addition, it appears

4    Dr. Schneider may have felt plaintiff was not likely to so decompensate, for although he did consider her

5    "functionally disabled" at the time, he also encouraged her "to attempt either volunteer or basic vocational

6    activities," which one would think certainly would involve more than the minimal increase or change that

7    Listings 12.03C.2 and 12.04C.2 contemplate.  The Commissioner on remand therefore should be re-visit as

8    well the issue of whether plaintiff meets or equals either of these Listings.

9    III.    The ALJ's Assessment of Plaintiff's Credibility

10           Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

11   639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749

12   F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

13   based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

14   claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

15   long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148

16   (9th Cir. 2001).

17           To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

18   the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

19   identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.;

20   Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

21   malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

22   Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. O'Donnell v.

23   Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

24           In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

25   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

26   testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

27   also may consider a claimant's work record and observations of physicians and other third parties

28   regarding the nature, onset, duration, and frequency of symptoms. Id.

1    The ALJ discounted plaintiff's credibility in part for the following reason:

2    I have found Ms. Hill's testimony not credible as her allegations as to severity and
     duration of her functional limitations are not supported by the medical evidence of
3    record. She has been diagnosed with bipolar disorder and/or schizoaffective disorder,
     bipolar type, which is/are likely to cause some limitations; however, objective findings
4    as noted above reveal she retains the ability to engage in basic work activities despite
     the limitations resulting from her impairments. There is no medical evidence of record
5    supporting findings she is incapable of sustaining work activity. To the contrary,
     treatment notes revealed she is able to function when taking prescribed medications and
6    her symptoms have generally been described as in "remission" after she filed for
     disability benefits and not lasting for a continuous period of 12 months as required by
7    the Social Security Act and Regulations.

8    Tr. 20. A determination that a claimant's complaints are "inconsistent with clinical observations" can

9    satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297

10   (9th Cir. 1998).

11       Plaintiff argues this stated reason for rejecting her credibility was improper, because the record

12   does contain medical evidence supportive of her claims of disabling symptoms, namely that of Drs.

13   Gardner, Essink and Schneider. The undersigned agrees. As discussed above, the opinions of these three

14   medical sources – at least with respect to the issue of whether plaintiff's mental impairments have reached

15   Listing-level severity – do provide support, to one extent or another, for plaintiff's allegation of disability.

16   Also as discussed above, however, it remains unclear whether those opinions are sufficient to make that

17   step three showing. In addition, again as discussed above, there is substantial evidence in the record

18   indicating that plaintiff's condition had improved and stabilized, allowing her to function fairly well, on

19   her medications. Thus, this reason for rejecting plaintiff's credibility should be re-assessed on remand.

20       Plaintiff argues the ALJ erred in finding she was able to function on medications. Specifically, she

21   asserts that while she certainly functions better because of them, she continues to experience sleepiness as

22   a result thereof, along with a continued inability to handle work stress. As just discussed, the issues of

23   work stress tolerance remains opens, and therefore requires further consideration on remand. Further,

24   although the record does contain some evidence of medication side effects such as sleepiness, again, other

25   evidence in the record shows an ability to function at a level greater than one would expect of someone

26   claiming an inability to work. Accordingly, while the undersigned is not expressly finding the ALJ erred

27   in discounting plaintiff's credibility for this reason, in light of the ALJ's failure to properly consider the

28   medical evidence in the record concerning her limitations, re-consideration of this reason is warranted as

REPORT AND RECOMMENDATION
Page - 18

1  well.

2  Plaintiff further takes issue with the ALJ's statement that her symptoms generally were described

3  in the medical record as being in remission.  She asserts this statement is not totally accurate, as the

4  medical evidence shows she has experienced some periods where her symptoms have worsened.  While

5  true, as discussed above, the great weight of that evidence indicates that for the most part plaintiff has

6  remained stabilized and in either whole or partial remission.  As such, the undersigned finds no particular

7  error on the part of the ALJ here.  Nevertheless, because this matter is being remanded in part for the

8  purposes of both re-evaluating the medical evidence in the record and re-assessing plaintiff's credibility,

9  this reason also should be re-considered.

10  The ALJ next discounted plaintiff's credibility because her daily activities were "not limited to the

11  extent one would expect, given the complaints of disabling symptoms and limitations," noting further more

12  specifically as follows:

> At the hearing, she testified that when taking prescribed medications, she has been able
> to go out to bars almost every Tuesday and Wednesday night for the past 2 years, with
> or without her friends, in order to karaoke.  She stated she is able to get up on a little
> stage to sing and read words off of the monitor.  She said she enjoys the attention and
> has an array of songs in her repertoir.  She testified she has only drunk water and no
> alcohol for the past 6 months due to new medications.  In addition to singing in public
> twice a week, the claimant is able to drive a car and use public transportation, take
> nursing classes, travel by herself to the library to study, read in 2 hour intervals, own
> and ride a horse, listen to music, go to the movies, go grocery shopping, and take care
> of her own personal hygiene and grooming . . .

Tr. 20.  To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or

her daily activities.  Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to

spend a substantial part of his or her day performing household chores or other activities that are

transferable to a work setting."  Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be

eligible for disability benefits, however, and "many home activities may not be easily transferable to a

work environment."  Id.

Plaintiff argues that none of the activities she has engaged in contradict her testimony regarding the

difficulty she alleges she has had handling the stress of competitive employment, or show that she could be

expected to successfully perform such employment.  While it may be that the activities the record shows

plaintiff engaged in do not themselves entirely equate with competitive employment, as set forth by the

ALJ and as described herein, those activities certainly indicate a greater than disabling level of ability to

REPORT AND RECOMMENDATION
Page - 19

1    perform activities of daily living and, by implication, work-related tasks.  Indeed, also as discussed above,

2    more than one medical source in the record, including Dr. Gardner and Dr. Schneider, encouraged her to

3    pursue volunteer or work-related activities, thereby indicating that at least to some extent they too believed

4    her to be more capable than she now alleges.  Given the unresolved issues concerning the evidence in the

5    record discussed herein regarding plaintiff's stress tolerance, however, remand for further consideration of

6    plaintiff's activities once more is warranted.

7            The ALJ also discounted plaintiff's credibility in part because her "work history shows she worked

8    only sporadically prior to filing for benefits," which raised "a question as to whether" plaintiff's

9    continuing unemployment was "actually due to medical impairments or if secondary gain is a possible

10   motive." Tr. 20.  Plaintiff argues this is not a convincing reason for rejecting her credibility, because the

11   record is devoid of any evidence of secondary gain.  The undersigned agrees.  The ALJ certainly may

12   consider motivation and the issue of secondary gain in rejecting symptom testimony. See Tidwell v. Apfel,

13   161 F.3d 599, 602 (9th Cir. 1998); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir.

14   1992).  Here, though, while plaintiff's work history may be sporadic, the ALJ pointed to no evidence in the

15   record of secondary gain or that she lacked motivation to pursue work.  This was error.

16           Lastly, the ALJ discounted plaintiff's credibility for the following reason:

17           There is also evidence claimant has not been entirely compliant in taking prescribed
             medications, and even she acknowledged during her testimony at the hearing that she
18           gets "whacked out" when not on medications.  This lack of compliance suggests her
             symptoms may not have been as limiting as the claimant has alleged in connection with
19           this application, or at a minimum demonstrates her general disregard for maintaining
             good mental health.
20

21   Tr. 20.  Failure to assert a good reason for not following a prescribed course of treatment, or a finding that

     a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." Fair
22
     v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).
23

24           Plaintiff argues this is not a convincing reason to reject her credibility, because it is not uncommon

25   for a person with mental illness to stop taking his or her medications when he or she feels better, and then

26   end up decompensating.  Plaintiff further argues the ALJ failed to consider that she had been experiencing

27   many side effects from her medications, including weight gain and hair loss.  Thus, she asserts, it is hardly

28   surprising she would want to stop taking them.  The problem, however, is that nowhere in the record did

     plaintiff state this was the reason she stopped taking her medication on a number of occasions, or that she

did so because she felt better.  The undersigned does realize, however, that this is a distinct possibility that the ALJ appears not to have considered.  As such, remand for further consideration by the Commissioner of this reason too is needed.

IV.     The ALJ's Evaluation of the Lay Witness Evidence in the Record

        Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

        The record contains statements from plaintiff's father regarding plaintiff's social functioning and activities of daily living. Tr. 73-77.  The ALJ addressed those statements as follows:

> The record contains a third-party questionaire from the claimant's father, Larry E. Hill, that supports disability for the claimant . . . This questionaire describes an individual who exhibits deficiencies and difficulties with most all activities.  Mr. Hill contends claimant is incapacitated, citing such factors being affecting [sic] by even minimal stress, needing constant reminders to perform daily activities and take medications, sleeps most of the day and takes long baths daily.  He opined that, without medication, the claimant would need to be hospitalized, and with medication still has problems dealing with daily stressors.  It is noted Mr. Hill did not mention the claimant's activities of daily living as reported at the hearing, as noted above, including attending class, studying, performing karoake, etc.  The statements made by Mr. Hill are of limited credibility considering the testimony of the claimant.  Furthermore, behavior exhibited or symptoms reported by a subject are not an adequate basis to establish disability.

Tr. 20.

        Plaintiff argues that Mr. Hill's failure to mention plaintiff's activities of daily living as she reported them at the hearing is not a valid reason for rejecting his statement, because it is not germane to him.  The undersigned disagrees.  Here, in light of the next sentence which plaintiff fails to mention – that Mr. Hill's statements were of limited credibility considering plaintiff's testimony – the ALJ was not faulting Mr. Hill for failing to note specifically that testimony, so much as he was pointing out that given plaintiff's own

REPORT AND RECOMMENDATION
Page - 21

1   testimony regarding her activities of daily living, Mr. Hill's claim that she had significant difficulties in

2   performing them was much less credible.  This was valid.  However, as noted by the ALJ, Mr. Hill did also

3   make statements concerning the extent of plaintiff's ability to handle stress, which as discussed previously

4   is an issue that remains unresolved.  Accordingly, to that extent, the Commissioner also shall re-consider

5   the statements Mr. Hill provided on remand as well.

6   V.      The ALJ's Assessment of Plaintiff's Residual Functional Capacity

7           If a disability determination "cannot be made on the basis of medical factors alone at step three of

8   the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

9   assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

10  claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or

11  she can do his or her past relevant work, and at step five to determine whether he or she can do other work.

12  Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

13          A claimant's residual functional capacity is the maximum amount of work the claimant is able to

14  perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

15  must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only

16  those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

17  claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional

18  limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other

19  evidence." Id. at *7.

20          Here, the ALJ assessed plaintiff with the following residual functional capacity:

21          The claimant has no exertional (strength) limitations.  Non-exertionally, she retains the
            residual functional capacity to perform simple, routine tasks during a normal workday
22          and week; to have occasional contact with the public; and to work with co-workers and
            supervisors.

23

24  Tr. 23.  Plaintiff argues this assessment is erroneous because the ALJ failed to properly consider all of the

25  medical opinion source evidence in the record, namely that of Drs. Gardner, Essink and Schneider, her

26  own testimony, and the statements of her father.  The undersigned agrees.  As discussed above, the ALJ

27  erred in evaluating the findings and opinions of the above three medical sources, and thus it is unclear

28  whether the ALJ included in plaintiff's RFC all of her mental functional limitations.  Also as discussed

    above, in light of that error, remand for further consideration of plaintiff's testimony and Mr. Hill's

1   statements should be had as well.  As such, reconsideration of the ALJ's assessment of plaintiff's residual

2   functional capacity is appropriate in this case.

3           In addition, plaintiff argues the ALJ also failed to properly consider the mental functional capacity

4   assessment provided by Kristine Harrison, Psy.D., and Thomas Clifford, Ph.D., who found plaintiff to

5   have a number of moderate to marked limitations in her understanding and memory, sustained

6   concentration and persistence, social interactions, and adaptation. Tr. 273-75.  Drs. Harrison and Clifford

7   also provided the following additional functional capacity assessment:

8           . . . [C]laimant can:

9           . . . Understand, remember and complete simple tasks . . . has limited motivation and
            poor concentration; complex tasks are precluded . . . The claimant's mental impairment
10          limits her capacity for complex tasks, but she is able to attend and persist on simple,
            routine tasks through a normal day/week.
11
            . . . The claimant does not manage stress and lacks motivation which may make
12          intensive public work difficult.  The claimant should avoid intensive work with the
            public, but can work with co-workers and a supervisor.
13
            . . . Claimant can meet basic adaptive demands of the workplace.  She will likely need
14          some supervision and guidance when faces [sic] with significant change or important,
            irrevocable decision-making.
15
    Tr. 275-76.
16
            The ALJ stated in his decision that he was giving significant weight to the opinions of Dr. Harrison
17
    and Dr. Clifford. Tr. 21-22.  Plaintiff though asserts that while he stated he was giving such weight to their
18
    opinions, the ALJ failed to include all of the limitations they found.  The undersigned agrees.  For
19
    example, Drs. Harrison and Clifford found plaintiff to be moderately limited in her ability to do all of the
20
    following: remember locations and work-like procedures; maintain attention and concentration for
21
    extended periods; perform activities within a schedule; maintain regular attendance; be punctual; sustain
22
    an ordinary routine without special supervision; complete a normal workday and workweek; perform at a
23
    consistent pace; respond appropriately to changes in the work setting; and set realistic goals or make plans
24
    independently of others. Tr. 273-75.  However, the ALJ gave no reasons why he did not adopt them.  This
25
    was error.
26
    VI.    The ALJ's Step Four Analysis
27
            Plaintiff has the burden at step four of the disability evaluation process to show that she is unable to
28
    return to her past relevant work. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).  Here, the ALJ

1   found that plaintiff could return to her past relevant work as an office helper/clerk. Tr. 22-23.  Plaintiff

2   argues this finding was erroneous, because it was based on the ALJ's improper residual functional capacity

3   assessment.  Again, the undersigned agrees.  In light of that improper RFC assessment, it is not at all clear

4   that plaintiff would be capable of returning to her past relevant work.  Plaintiff further argues the ALJ also

5   erred in failing to consider or mention her own testimony that she was fired from her data entry clerk job

6   because of difficulties she had with that job, and in failing to acknowledge that state agency adjudicators

7   found her to be unable to perform her past relevant work.  While it is unclear this evidence in itself would

8   be sufficient to find plaintiff incapable of returning to her past relevant work (see Tr. 99, 473, 475), it too

9   should be re-evaluated on remand.

10  VII.    Step Five of the Sequential Disability Evaluation Process

11          If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

12  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

13  able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The

14  ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's

15  Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240

16  F.3d 1157, 1162 (9th Cir. 2000).

17          An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

18  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

19  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

20  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

21  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

22  by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

23  that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th

24  Cir. 2001).

25          In this case, the ALJ posed a hypothetical question to the vocational expert containing substantially

26  the same limitations as those he including in plaintiff's residual functional capacity assessment. Tr. 474-

27  75. Plaintiff argues the Commissioner failed to meet his burden of establishing she is capable of

28  performing other work existing in significant numbers in the national economy, because the hypothetical

question the ALJ posed to the vocational expert did not include all of her limitations and thus was

REPORT AND RECOMMENDATION
Page - 24

incomplete.  The undersigned agrees that in light of the errors discussed above, it cannot be said the hypothetical question the ALJ posed contained all of plaintiff's limitations.  However, as noted above, the ALJ found – though erroneously – plaintiff to be not disabled at step four of the sequential disability evaluation process, and therefore was not required to proceed on to step five.  Nor, for the reasons set forth above, does the record definitively show plaintiff incapable of performing all work.  Accordingly, on remand, should plaintiff be found not to be capable of returning to her past relevant work at step four, the Commissioner should then make the appropriate findings at step five.

VIII.    <u>This Matter Should Be Remanded for Further Administrative Proceedings</u>

The Court may remand this case "either for additional evidence and findings or to award benefits." <u>Smolen</u>, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." <u>Benecke v. Barnhart</u>, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." <u>Id.</u>

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." <u>Smolen</u>, 80 F.3d at 1292; <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

(1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

<u>Smolen</u>, 80 F.3d 1273 at 1292; <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues still remain concerning the medical evidence in the record, whether plaintiff's mental impairments meet or equal the criteria of any of those contained in the Listings, plaintiff's credibility and the credibility of her father's statements, plaintiff's residual functional capacity, and plaintiff's ability to return to her past relevant work, this matter should be remanded to the Commissioner for further administrative proceedings.  In addition, if on remand, plaintiff is found to be incapable of returning to her past relevant work, then the Commissioner shall determine at step five of the sequential disability evaluation process whether plaintiff is able to perform other jobs existing in significant numbers in the national economy.

Plaintiff argues that because the ALJ erred in evaluating the medical evidence in the record and the

REPORT AND RECOMMENDATION
Page - 25

1  lay statement of her father, and in assessing her own testimony, that evidence all must be credited as true.

2  The undersigned disagrees.  It is true that where the ALJ has failed "to provide adequate reasons for

3  rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter

4  of law."  Lester, 81 F.3d at 834 (citation omitted).  However, where the ALJ is not required to find the

5  claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and

6  thus the Smolen test will not be found to have been met.  Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th

7  Cir. 2003).  Further, "[i]n cases where the vocational expert has failed to address a claimant's limitations

8  as established by improperly discredited evidence," the Ninth Circuit  "consistently [has] remanded for

9  further proceedings rather than payment of benefits." Bunnell, 336 F.3d at 1116.

10  It also is true that the Ninth Circuit has held remand for an award of benefits is required where the

11  ALJ's reasons for discounting the claimant's credibility are not legally sufficient, and "it is clear from the

12  record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's

13  testimony." Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003).  The Court of Appeals in Connett went

14  on to state, however, it was "not convinced" the "crediting as true" rule was mandatory. Id.  Thus, at least

15  where findings are insufficient as to whether a claimant's testimony should be "credited as true," it appears

16  the courts "have some flexibility in applying" that rule. Id.; but see Benecke v. Barnhart, 379 F.3d 587,

17  593 (9th Cir. 2004) (applying "crediting as true" rule, but noting its contrary holding in Connett).

18  Finally, where lay witness evidence is improperly rejected, that testimony may be credited as a

19  matter of law. See Schneider v. Barnhart, 223 F.3d 968, 976 (9th Cir. 2000) (when lay evidence rejected

20  by ALJ was given effect required by federal regulations, it became clear claimant's limitations were

21  sufficient to meet or equal listed impairment).  As noted above, though, the courts do have "some

22  flexibility" in how they apply the "credit as true" rule. Connett, 340 F.3d at 876.  Further, Schneider dealt

23  with the situation where the Commissioner had failed to cite any evidence to contradict the statements of

24  five lay witnesses regarding her disabling impairments. 223 F.3d at 976.  Thus, while the ALJ did not

25  properly evaluate the medical and other evidence in the record, for the reasons set forth above, it is not at

26  all clear that the ALJ would be required to find plaintiff disabled, and, therefore, remand is proper.

27  Plaintiff argues that should this matter be remanded for further administrative proceedings, given

28  the ALJ's errors, it is doubtful the ALJ is capable of fairly considering her disability claim.  Accordingly,

plaintiff requests the Court order that this case be assigned to a new ALJ.  The undersigned disagrees.  The

1   requirements of due process do demand "impartiality on the part of those who function in judicial or

2   quasi-judicial capacities." <u>Schweiker v. McClure</u>, 456 U.S. 188, 195 (1982).  Hearing officers who decide

3   social security claims, however, are presumed to be unbiased. <u>Id.</u>  This presumption "can be rebutted by a

4   showing of conflict of interest or some other specific reason for disqualification." <u>Id.</u>

5         The burden of establishing such a disqualifying interest "rests on the party making the assertion."

6   <u>Id.</u> at 196.  That party must show "the ALJ's behavior, in the context of the whole case, was 'so extreme as

7   to display clear inability to render fair judgment.'" <u>Rollins v. Massanari</u>, 246 F.3d 853, 858 (9th Cir. 2001)

8   (citing <u>Liteky v. United States</u>, 510 U.S. 540, 555-56 (1994)).  In addition, "actual bias," rather than the

9   "mere appearance of impropriety," must be shown in order to disqualify an ALJ. <u>Bunnell v. Barnhart</u>, 336

10  F.3d 1112, 1115 (9th Cir. 2003).  Although the ALJ did commit clear errors here, plaintiff has failed to

11  show the kind of bias or unfair treatment required by case law.  As such, the undersigned declines to order

12  a new ALJ be assigned on remand, though, of course, the Commissioner may choose to do so.

CONCLUSION

14        Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

15  was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

16  further administrative proceedings in accordance with the findings contained herein.

17        Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

18  the parties shall have ten (10) days from service of this Report and Recommendation to file written

19  objections thereto. <u>See also</u> Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

20  objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit

21  imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **July 11, 2008**, as

22  noted in the caption.

23        DATED this 16th day of June, 2008.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 27